UNITED STATES v. STANDARD SANITARY MFG. CO. et al.

(Circuit Court, D. Maryland. October 13, 1911.)

1. MONOPOLIES (§ 17*)—ANTI-TRUST ACT—CONTRACTS IN RESTRAINT OF TRADE.

Sixteen corporations, producing 78 per cent. of all the sanitary enameled iron ware, such as bathtubs, sinks, etc., made in the United States, by mutual agreement previously made, entered into contracts by which they bound themselves to sell only certain grades of the ware only at prices and on terms fixed in schedules attached, or by a committee, and only to jobbers who should sign the resale contract prepared by them. Such contract was signed by 80 per cent. of the jobbers in the United States, and bound them to purchase only from some one of the 16 manufacturers, and to sell only at prices named in their resale price lists. *Held*, that such contracts entered into by the manufacturers were solely for the purpose of fixing prices and destroying competition, and constituted a combination in restraint of interstate commerce, and an attempt to monopolize such commerce, which was unlawful, as in violation of Sherman Anti-Trust Act July 2, 1890, c. 647, §§ 1, 2, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200).

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. § 17.*]

2. MONOPOLIES (§ 14*) — ANTI-TRUST ACT — ILLEGALITY OF CONTRACTS — RESTRAINT OF COMPETITION.

Where the necessary effect of an agreement between manufacturers is clearly to restrain interstate trade within the purview of Sherman Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), it cannot be taken out of the category of the unlawful by general reasoning as to its expediency or nonexpediency or the wisdom or want of wisdom of the statute.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 14.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

8. MONOPOLIES (§ 14*)—ANTI-TRUST ACT—COMBINATIONS IN RESTRAINT OF IN-
TERSTATE COMMERCE—EFFECT OF USE OF PATENTED DEVICE.

A combination between a large majority of the manufacturers of enam-
eled iron ware in the United States for the purpose of fixing prices, and
which is clearly in restraint of interstate trade, is not saved from illegal-
ity under the Sherman Anti-Trust Act July 2, 1890, c. 647, § 1, 26 Stat.
209 (U. S. Comp. St. 1901, p. 3200), by the fact that the contracts creating
the combination were embodied in licenses to its members to use a pat-
ented automatic dredger, which was a useful and time-saving tool used
in finishing the ware to sprinkle the last two or more coats of powdered
enamel on the heated iron; the ware itself being unpatented, and the
enameling being but one of several operations required in its production,
to which operation even the patented dredger was not essential, but
merely an improvement on the hand operated dredgers of the prior art,
still in use in some factories.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 14.*]

4. MONOPOLIES (§ 8*)—ANTI-TRUST ACT—USE OF PATENTED ARTICLE.

In spite of the Sherman act, the patentee may monopolize for the term
of his patent the thing which he or his assignor invented. If by the com-
mon law, or the statutes of a state, or by the enactments of Congress,
men are forbidden to restrain trade or to monopolize it, a patentee may
not restrain trade or attempt to monopolize it in anything except that
which is covered by his patent.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 8.*]

5. MONOPOLIES (§ 24*)—ANTI-TRUST ACT—SUIT TO ENJOIN VIOLATION—PEN-
DENCY OF CRIMINAL PROSECUTION.

Unless in an exceptional case, a federal court of equity will not post-
pone the hearing and decision of a suit brought by the United States un-
der Sherman Anti-Trust Act July 2, 1890, c. 647, § 4, 26 Stat. 209 (U. S.
Comp. St. 1901, p. 3201), to enjoin violation of the act to await the de-
termination of a criminal prosecution against some of the same defend-
ants based on the same alleged violations.

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 24.*]

6. COMMERCE (§ 40*)—INTERSTATE COMMERCE—WHAT CONSTITUTES.

A manufacturing company which makes its product in one state and
stores it in warerooms in other states, where it is sold, the trade extend-
ing over several states, is engaged in interstate commerce.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 29, 30; Dec.
Dig. § 40.*]

7. MONOPOLIES (§ 24*)—ANTI-TRUST ACT—SUIT FOR VIOLATION—PARTIES.

Officers of corporations which entered into an illegal combination in
restraint of interstate commerce, who personally took no part in the
formation of such combination, are not proper parties defendant in a suit
against the corporations for an injunction under Sherman Anti-Trust Act
July 2, 1890, c. 647, § 4, 26 Stat. 209 (U S. Comp. St. 1901, p. 3201).

[Ed. Note.—For other cases, see Monopolies, Dec. Dig. § 24.*]

8. PATENTS (§ 1*)—DEFINITION.

A patent is a grant of a right to exclude all others from making, using,
or selling the invention covered by it.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 1; Dec. Dig. § 1.*
For other definitions, see Words and Phrases, vol. 6, pp. 5228–5231;
vol. 8, p. 7748.]

Goff, Circuit Judge, dissenting.

In Equity. Suit by the United States against the Standard Sanitary
Manufacturing Company and others. On final hearing. Decree for
complainant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

Edwin P. Grosvenor, John Philip Hill, and James A. Fowler, for the United States.

Herbert Noble, William L. Marbury, and Hartwell P. Heath, for Standard Sanitary Mfg. Co. and others.

Robert B. Honeyman, for Colwell Lead Co.

Before GOFF and PRITCHARD, Circuit Judges, and ROSE, District Judge.

ROSE, District Judge. The United States brings this suit. It will be called the government. Its petition is filed under the fourth section of the Sherman anti-trust act. It charges that the defendants have violated the first and second sections of that act. It says that they have conspired to restrain interstate trade in sanitary enameled iron ware, and have attempted to monopolize such trade therein. All the defendants are concerned in making and selling that ware. It is made of cast iron. It is coated with enamel. It has the appearance of being porcelain lined. Bathtubs, lavatories, closet bowls, and tanks, sinks, and urinals are among the more important articles made of it. It will be referred to as the ware.

There are 50 defendants. Sixteen are corporations. They will be called the corporate defendants. Thirty-four are individuals. They are styled individual defendants. One of them is Edwin L. Wayman. With him each of the corporate defendants made an agreement. These agreements the government says restrain trade in the ware, and attempt to monopolize it. The other 33 individual defendants are officers of the corporate defendants. The government charges that they each were among the persons who knowingly caused the corporate defendants to do that of which it complains.

These 16 agreements were, with exceptions to be mentioned, identical in their language. At least 15 of the 16 corporate defendants had directly or indirectly taken part in drafting the common form. They were executed by nearly all the corporate defendants on the same day and at the same place. No defendant entered into the agreement without knowing that at least 13 of the other corporate defendants had executed it, or intended so to do. Without this knowledge no one of them would have become a party to it. Each of these agreements is in the form of a license granted by Wayman accepted by a corporate defendant. The patents under which the licenses purported to be granted were first put into Wayman's name two days before most of the agreements were executed. The terms of the agreements had been definitely settled at least two weeks earlier. There were three patents. They all were for automatic dredgers. A dredger is a tool used in the enameling step of making the ware. The licenses were granted for a period of two years, beginning June 1, 1910. Each licensee promised on the 5th day of each month to pay $5 a day for each furnace used by it for the making of the ware during the preceding month. Wayman undertook that he would three months later pay back $4 out of every $5. This undertaking was conditioned upon the licensee having in the meantime done all he had agreed to do. There are about 25 working days a month. Wayman

on the 5th of every month, therefore, received $125 for each furnace continuously operated during the preceding month by any one of his licensees. One hundred dollars of this he was eventually to pay back. This repayment was not to be made until three months had gone by. After the first four months, he would always have in his hands $300 of his licensees' money for every furnace of theirs in steady use. As it actually turned out, he usually held between $40,000 and $50,000 belonging to them. This money was in the nature of cash bail. Each corporate defendant in this manner gave security that he would keep his bargain, or be good, as one of the licensees expressed it. Each corporate defendant promised to do three things: (1) It would not sell any "seconds" or "Bs" of any of the ware except bathtubs. It apparently reserved the right to market what the trade calls "nonguaranteed" bathtubs. (2) It would not sell any ware to any jobber who did not sign the jobber's resale agreement to be presently described. (3) It would not sell anybody any ware at a lower price or upon more attractive terms than those named in the agreement or in a schedule attached to it. This schedule named standard prices for each article of the ware and for each size, shape, and grade of that article. All the corporate defendants promised that they would not sell some articles below the scheduled price. Some of them undertook not to sell any articles below these prices. Some of the corporate defendants had not the established reputation of others, or they had not as efficient a selling force. They would not take licenses unless they were allowed to sell some articles at a little lower price than those quoted by their stronger rivals. After much negotiation, it was settled by a committee of the corporate defendants that some of them should be allowed to sell some articles at a discount of $2\frac{1}{2}$ in some instances, of 5 per cent. in others, from the scheduled prices. The permission to give this discount, granted to some of the corporate defendants and not to others, was the only respect in which there was any difference among any of the agreements as executed. The negotiation as to which of the corporate defendants should be allowed by the others to give these preferential prices to their customers and how great the permitted discount should be was finished before any of the agreements were executed and before any of the patents had been put in Wayman's name. The resale agreement which the jobber in the ware was required to sign bound him in two respects: (1) He could not buy any ware from any one other than the corporate defendants. (2) He could not sell ware to anybody at a lower price or on more attractive terms than those named in the resale price lists.

The principles upon which these resale prices were to be worked out in detail had been agreed upon between Wayman and a committee chosen by nearly all of the corporate defendants. This agreement was reached before any licenses were accepted, and before any of the patents had become Wayman's. The licenses provided that no changes in the sale or resale prices could be made without the consent of Wayman and the majority of a committee elected by the corporate defendants. The agreements restricted in a number of ways the freedom of both the corporate defendants who made the ware and the jobbers

who sold it to the plumbers. An article of the ware must always be billed separately from other goods sold at the same time to the same person. Many articles could not be shipped uncrated. No allowance could be made for a returned crate and so on. There were jobbers to whom these rules or some of them were distasteful. Dealers were forced to change their methods of doing business which they had followed for years to the mutual satisfaction of themselves and their customers. These requirements had a purpose. Competition in price cannot be altogether shut off unless everybody is made in some respects to do business in precisely the same way as everybody else. Each jobber, like each maker, was called on to give cash security that he would carry out his bargain. He had to pay 5 per cent. more for the ware than the maker expected to get out of it. If he had not cut prices and had not bought ware from any one other than the corporate defendants at the end of the calendar year, he was entitled to receive a rebate of 5 per cent. on the amount paid by him during the year. If his purchases from all the corporate defendants combined had amounted to as much as $30,000, his rebate was to be at the rate of 10 per cent. Applications for rebates were to be made to Wayman. When he approved them, they were paid by the corporate defendant or defendants which had sold the applicant the ware. Nearly 400 jobbers signed these agreements. They constituted more than four-fifths of all the jobbers in the country. The consumption of the ware is large. Wayman doubtfully estimated the annual value of the national output of it at $14,000,000. It is hardly less than $10,000,000. It may be much more. Upwards of 80 per cent. of the jobbers took licenses. They probably handled at least 80 per cent. of the product; that is, their total yearly purchases from the corporate defendants must have footed up about $8,000,000. A rebate of 5 per cent. on $8,000,000 amounts to $400,000 of 10 per cent. to $800,000. Towards the close of every calendar year the corporate defendants would among them hold in the neighborhood of half a million of the jobbers' money. Moreover, the agreements told the jobbers in plain words that, if they cut prices or bought ware from anybody other than the corporate defendants, none of the latter would sell them again. There were jobbers who did not like some of the new rules. Some of them thought their money would be more useful in their own bank account than in that of the corporate defendants. A little less than one-fifth of them refused to sign the agreements.

On the other hand, there was from the jobbers' standpoint much that was attractive in the scheme as a whole. Competition had been fierce. It had not always been either wise or honest. A badly made article may look well enough to deceive the average householder. Many such had been put on the. market. When the defects were speedily discovered, the jobber might have to take back the article. The cost of doing so ate up the profit on a number of like articles which were not returned. There was little profit in handling the ware. If every dealer signed the agreement, none of them could gain by taking from the makers and putting off on the public any ware except bathtubs, not standard of its kind. The lowest price the mak-

ers could take would buy a good article. No one would have a "second" if for the same money he could get a standard. Moreover, while nonguaranteed bathtubs could be sold, the price below which they could not be sold was fixed. The jobbers would therefore insist on getting the best of that not very good grade. With the worst made articles taken out of the market, friction with customers would be lessened. The reputation of the ware would be raised. Every jobber would know that he was buying and selling on the same terms as his competitors. He could tell to the fraction of a cent what his gross profit on every article sold by him would be. He could regulate accordingly his expenditures for handling and advertising it. If he did not take a license, he took large chances. No one of the corporate defendants would sell to him.

Of 250 furnaces in the country the defendants owned 195, or 78 per cent. In drawing building specifications architects frequently called for ware made by a particular manufacturer. A jobber who could not furnish a plumber with what he wanted for a large job was likely to lose his custom altogether. May, 1910, must have been a trying time for jobbers with a stubborn liking for independence, and a taste for managing their own business in their own way. As already stated, in the end four out of every five of the jobbers signed up. Many of them did so willingly and even enthusiastically. It is probable that the large majority of them welcomed the chance of doing so. Their associations had been urging the manufacturers to put in force a resale arrangement. A number of them have testified that they wanted it. While it lasted, they say they found it pleasant and profitable. In consequence of these proceedings and of other action taken by the government, the corporate defendants on January 1, 1911, suspended so much of the agreements as fixed original and resale prices. Many of the jobbers regret the suspension.

With whatever of enthusiasm, with whatever of reluctance, the makers of nearly four-fifths of the ware and more than four out of every five dealers in it became parties to the combination. The corporate defendants, and many, if not most, of the jobbers, were engaged in interstate commerce in the ware. Such commerce was directly restrained by the agreements. The makers who became parties to them could no longer sell the jobbers who did not. The jobbers who did could no longer buy from the makers who did not. The defendants did their best to get all the makers of importance and all the dealers to become parties to the scheme. If they had succeeded, Wayman and a committee of the corporate defendants would for two years from June 1, 1910, have been able to say that no man anywhere in the United States should buy a bathtub or any other article of the ware at a lower price than it might have suited them to fix. If the trade would then have been monopolized, the defendants attempted to monopolize it.

The important questions in the case are two: (1) Would such a combination as was attempted, and in large part brought about, have violated the Sherman act, had patents on automatic dredgers played

191 F.—12

no part in it?  (2) If it would, did the part played by those patents make lawful what otherwise would have been forbidden?

The defendants argue that not every agreement to fix and maintain prices in interstate commerce violate the Sherman act.  They say that eyes illumined by the light of reason will see that what the defendants did was from the standpoint of the public interests good, and not evil. They contend that the jobbers were making little profit on the ware. It was troublesome and costly to handle.  "Seconds" were on the market.  The ware was getting a bad reputation.  If the defendants had not done what they did, there would soon have been no trade either to restrain or to monopolize.  There is little in the record to support this contention.  Such an apprehension is vaguely expressed by some witnesses.  If there had been marked falling off in the sale of the ware, the defendants know it.  They could have shown it by definite and precise figures.  They made no attempt to do so.  If there was any such danger, it was very remote, far too remote to justify the defendants in doing anything which except for it would have been unlawful.  That there was any real danger at all is not shown.  According to the defendants, the public gained by what was done even upon the assumption that, if it had been left undone, the trade would have continued in undiminished volume.  The ultimate purchaser of the ware seldom knows whether he gets a well-made article.  To his eyes it may look well.  He may think that it will for years be useful, sightly, and sanitary.  In a few months he may find that it is wearing badly, and has become unsightly.  He may have reason to fear that to some slight extent it has become dangerous to the health of himself and his family.  He suffers from the greed of the maker, the jobber, or the plumber, or of two or all of them.  He will be in no danger from that greed when no one of them can any longer make any money by selling him a bad article for the price of a good.  Human nature being what it is, no other effective protection can be given him.  If the so-called "seconds" and "Bs" are put upon the market at all, most of them will in the end be bought by people who do not know what they are buying.  It is useless, according to this argument, to call the makers together and ask them to stop selling such goods.  Resolutions pledging all the manufacturers to stop making and selling them, it is true, may be easily passed.  They will be adopted with enthusiasm or with solemnity according to the mood of the moment, but always with absolute unanimity.  Like so many other gentlemen's agreements, they will be straightway broken.

If an enforceable bargain can be made that no goods shall be sold below a certain fixed price, which will yield a reasonable profit on a first-class article, jobbers and plumbers can be depended upon not to pay that price for an inferior article.  The defendants say that in no other way can seconds be taken off the market and kept off.  They point to what happened after January 1, 1911, when the price-fixing provisions of the agreement were suspended.  The prohibitions against selling "Bs" and "seconds" were still in full force.  Nevertheless the defendants' witnesses say that the market was at once flooded with low-grade ware.  Much of it came from some of the corporate de-

fendants.  It may be better for the public to pay a higher price for better ware.   Most individuals find that it is usually cheaper in the end.

Still, two questions remain: (1) Does the law permit the additional price which the public is to pay to be fixed by a combination of dealers even if the latter do so, because they cannot in any other way keep some of their own number from selling bad ware for good?   (2) Has the experience of mankind led them to believe that to permit all the makers and dealers in articles of common use to combine to fix the prices and terms below which those goods may not be sold will tend in the long run to improve the quality of the goods?

The second question is not for the courts.   The learned counsel for the defendants say that the first need not be answered in this case.  They claim that prices were not raised by the defendants.   They assert that the evidence shows that they were in fact lowered.   The contention rests on a statement of Wayman.  He says that the prices as fixed were intended to be on an average about 5 per cent. below those named in the last previously published price list of the defendant, the Standard Sanitary Manufacturing Company.   The counsel for the defendants in supposing that Wayman meant that he reduced the then actually prevailing prices have misapprehended the market conditions.   They assume that the Standard and the other corporate defendants were in fact getting the prices set forth in their catalogue.  The record shows that they were not.  Whether they ever had does not appear.  They certainly had not during any of the period as to which the record speaks.  If in the winter and spring of 1910 those prices had prevailed, there would have been no agreements and consequently no case.  The agreements as made became fully operative June 4, 1910.  No witness says that the published list prices had for many months been generally paid.  The evidence is overwhelming that they had not.

On August 4, 1909, Wayman became commissioner or actuary of a newly organized or reorganized Sanitary Enameled Ware Association. All the corporate defendants, except the Kerner Manufacturing Company, belonged to it.  Four other makers of the ware were members of it.  These four refused to enter into the price agreements. Consequently they did not take licenses from Wayman.  One of his duties as commissioner of the association appears to have been to do what he could by argument and expostulation to prevent price cutting among its members.  To this end he wrote many letters.  In one of them he speaks of cuts from 2½ to 5 per cent. below the published prices as the normal and usual thing.  He takes them for granted. They are not cause for complaint.  What worries him is the cuts of 20 per cent. which he says were then being made.  In March, 1910, the terms of the agreements executed two months later were being worked out by correspondence and conferences among the defendants. In that month Commissioner Wayman urged the members of the association to stop quoting what he called the "ridiculous" prices which had recently been made.  The Standard Sanitary Manufacturing Company, whose published price lists defendants' counsel suppose show the actual market prices, appears to have had a regularly organized system

of rebates. When the agreements now in controversy went into effect, the Standard notified its customers that their special rebates would be withdrawn. They were told, however, that checks would be sent them for whatever rebates were then due. The correspondence between the Standard and another of its customers shows that he had been buying at the "supposed" car load limit price less a confidential 7½ per cent. discount. Whether the "supposed" car load limit price was the published price or a generally understood discount below it does not appear.

The record contains many letters written by jobbers to some one or the other of the corporate defendants asking that orders alleged to have been sent in before June 4, 1910, should be filled at the old prices. Sometimes their requests were granted. They were grateful. Sometimes they were told that their order had not come to hand before June 4th. If filled, it must be at the new prices. A long correspondence usually followed. The jobber tried hard to get the ware at the old price. Many letters passed between one Sullwold and the defendant Ahrens. Ahrens is president of the Standard. Sullwold is head of a Minneapolis jobbing house. He did not like the new scheme. Ahrens tried to get him to come into it. They wrote each other at great length. They go into many details. Whenever one thinks he can make a point on the other, he does so. Sullwold repeatedly says that the ware will cost the jobbers more. Ahrens does not deny. Both take it for granted. Wayman testifies that to stop "ruinous competition" was one of the purposes of the agreements.

The J. M. Kohler Sons Company of Sheboygan, Wis., was a member of the Sanitary Enameled Ware Association. Wayman and a number of the defendants worked hard to get it to take a license. It would not. It claimed that the scheme was a price agreement, pure and simple. It said that price agreements were forbidden by the laws of the United States and of Wisconsin. One Kroos is connected with it. He was a witness for the government. He presented some elaborate calculations as to the difference between the prices his company had been getting for the ware and the prices it would have received under the Wayman plan. As he figured it, the latter were in every instance greater. The difference ranged from 1 to 45 per cent. Defendants' counsel say that he did not know what he was talking about. According to them, he did not understand how the price tables of the defendants were to be applied. He, however, gave the prices of his own company for the various articles principally dealt in by it and the defendants. It would have been easy for the latter to show what the true comparison was, if it had seemed to them expedient so to do. It is, however, not important to determine whether Kroos did or did not fall into error. There is in the record a letter to the Standard Sanitary Manufacturing Company from one of its customers. It was written shortly after the price agreements went into effect. In it the writer remarks that, of course, the Standard understood that he could not do much with their prices so long as Kohler continued to sell at the prices it was then making. Quite clearly the new prices were materially higher than Kohler's. The record shows that the agreements

were intended to raise prices, and that they did so. How great the increase was is not shown either in percentages or in dollars and cents. To have figured it out would have taken much time and money. Very likely no one knows how much prices were raised. Each defendant knows how much more it took in under the agreements than it had obtained before. No one of them had any accurate knowledge as to the gain made by any one of its fifteen corporate codefendants. Not every one of them would have found it easy to tell what the precise percentage of increase in the price received by it for each kind of article had been. Before the agreements went into effect, there was no fixed price. In every large transaction and in many that were not large the price actually paid was the outcome of a special and usually of a secret bargain.

Not only did the agreements raise prices—they prevented reductions that would otherwise have been made. The market conditions in the winter and spring of 1910 were such that prices left to themselves would have gone still lower. How rapidly the drop would have run into money is shown by a statement of the president of the Standard. He was trying to get the Kohler Company to take a license. He pointed out how good a thing the scheme was from the manufacturer's standpoint. He said, if it did not go through, it would cost the Standard's stockholders $300,000 in 1910, for in that event he would have to reduce prices. The defendants say that prices may be too low for the public good. Competition may be carried far enough to hurt everybody concerned. It may in the end be the direct cause of monopoly. Under its stress all but the strongest producers may go to the wall. The government replies that, if all the makers of an article of common use combine to raise and maintain prices and to punish any one of their number who reduces them, all the evils which to common experience of mankind result from monopolies will surely follow. Possibly both the defendants and the government speak truly. It may be that one of the great problems of the day is to find some way of protecting the general public against monopolistic combinations without compelling business men to subject themselves and their capital to all the perils of unrestrained competition. To find its solution would appear to be the business of the statesman. The defendants say the courts may give it. In their opinion makers and dealers may combine to raise prices without violating the Sherman act, provided that the prices fixed by their agreement are not unreasonably high.

In each particular case upon the evidence submitted the courts must say whether the prices asked are or are not reasonable. It would not be an easy task. Some standard of reasonableness would have to be worked out. The factors to be taken into account would be numerous and complex. The labor and expense of finding out what all the relevant facts were would be enormous. After all was done and said, the margin of doubt would usually remain large. If the dealers were bound to show affirmatively that their prices were reasonable, the government would usually win. If the government had to show that they were unreasonably high, it would ordinarily lose. In this case the defendants assume that the burden of proof as to the unreasonableness

of their prices is on the government. They say, and say truly, that the government has neither shown nor attempted to show that the schedule prices were unreasonable. The government replies every agreement to fix prices and to force or bribe makers or dealers to maintain them is illegal. In its view there are no circumstances in this case which take it out of the general rule. The presumption of law is that the prices which have been made by the free and untrammeled trafficking of the market place are the reasonable prices. Any one who interferes with the natural action and interaction of this bargaining assumes the burden of showing that what he did was fair and reasonable. If such a burden rests on the defendants, it has not been sustained. They have not shown what capital they have invested in the business. They have not told what net profit, if any, they earned under the old prices.

These opposing contentions raise questions of great moment and of exceeding difficulty. To answer them wisely may require going to the very roots of our conceptions of what the relation of the state to the industrial life of its people should be. Every one has the right to discuss them. It may be a duty to do so at all reasonable times and in all proper places. This opinion is not a proper place for such a discussion. Some men believe that price agreements should be sustained by the courts, unless they are shown to be against the public interest. Others hold that they may be permitted only when it is affirmatively shown that they promote the public interest. Still others say that a price agreement pure and simple is always illegal. That the Supreme Court has declared the last of the above-stated contentions to be the law is conclusive here. Only a few months ago it said:

"Agreements or combinations between dealers having for their sole purpose the destruction of competition and the fixing of prices are injurious to the public interests, and void." Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U. S. 408, 31 Sup. Ct. 384, 55 L. Ed. 502.

[2] At the moment we are considering only one question, Would the agreements have violated the Sherman act had the dredger patents had no part in them? They destroyed competition. They fixed prices. For that purpose they were made. They had no other. Defendants say that to fix prices and to destroy competition would have been to their profit and to the public good. They may not break the law because they think that it will be well to do so. In view of the character of the parties, the necessary effect of the agreements was clearly to restrain trade within the purview of the statute. In such case they cannot be taken out of the category of the unlawful by general reasoning as to their expediency or nonexpediency or the wisdom or want of wisdom of the statute which prohibited their being made. When the nature and character of the contracts create a conclusive presumption bringing them within the statute, such a result is not to be disregarded by the courts by a substitution of a judicial appreciation of what the law ought to be for the plain judicial duty of enforcing the law as it is. Standard Oil Co. v. United States, 221 U. S. 65, 31 Sup. Ct. 502, 55 L. Ed. 619.

It follows from what has been said that, unless protected by the terms or the policy of the patent laws, the agreements violate the Sherman act.

[3] 2. Did the part played by the patents make lawful what was otherwise forbidden? The ware is made of cast iron. After it has been shaped, it is enameled. Enameling involves two distinct processes. In each there are several steps. The ware is first given what is called the "slush" coat. This is enamel applied in liquid form. It is burnt on the base by the application of intense heat. The article is placed in a furnace. It is raised to a red heat, say 1,500 degrees Fahrenheit or upwards. It is taken from the furnace. While it still glows, powdered enamel is sprinkled upon it. It is put back in the furnace. It is again heated. When it is taken out, it usually is again sprinkled with the powder. If so, it is again reheated to fuse the enamel upon its surface. This process may be repeated indefinitely. Ordinarily two coats of the powder suffice. When the last has been burnt on, the ware is allowed to cool. It is ready for finishing, inspection, cleaning, shipment, and sale.

The patents spoken of in this case are for automatic dredgers. A dredger is used to sprinkle the powdered enamel on the ware. It serves no other purpose. It is not used in making the iron, or the ware out of the iron, or the liquid, or the powdered enamel, nor in the construction, the heating, or operation of the furnace, nor in taking the weighty and red-hot metal out of the furnace and putting it back. In the doing of these things many compositions of matter, machines, tools, appliances, and processes are employed. Upon the well doing of every one of them the usefulness, the attractiveness, and the durability of the ware depend. Whether any one of them shall be well or ill, cheaply or expensively, done, turns in greater or less degree upon the fitness and adaptability of the compositions, machines, tools, appliances, and processes used. Any patentable improvement in any one of them would bear the same relation to the ware as is borne by the automatic dredgers. There might be differences of degree in either direction. In legal theory no distinction would be possible. From this point of view further inquiry into the precise degree of usefulness of the automatic dredger in the sprinkling step of the enameling process of making the ware might be omitted.

The question of law will be, in any event, whether the owner of a patent on one of many tools used in the making of a particular kind of unpatented ware may lawfully make such agreements with reference to it as those in the record. This case is, however, one of importance. In certain respects it is suggested that it is one of the first impressions. It will be well, therefore, to understand how the enameler would like to sprinkle the powder, and to what extent and in what way the automatic dredger helps him to do it as he would. He wants to use little powder. It is more or less costly. The thinner the enamel coat, the better the ware looks and lasts. The whole surface of the article must be covered; otherwise it will be almost or altogether useless. The more uniform the coat of enamel is, the more sightly and durable it will be. If little powder is to fully cover the

entire surface, it must be applied in a finely divided form. Every portion of the surface must receive as nearly as may be precisely the same amount of powder as any other portion of like extent. The sprinkling must therefore be done with great evenness and regularity. It must be done quickly. The powder will not attach itself firmly to the base, unless fused upon it. If every minute portion of the surface is to be covered, the powder must melt and run in liquid form the moment it touches the article. The sprinkling must consequently be done and finished while the iron remains hot enough to liquify the enamel the instant the latter touches the former. For this purpose a minimum temperature of 1,200 degrees Fahrenheit is required. It is true that, if time does not suffice to sprinkle the powder over the entire surface, the article may be returned to the furnace and reheated. When taken out again, the uncovered portion may be sprinkled. A coat applied in installments does not usually look well to an expert eye. It is costly. So to put it on takes more time and more fuel. The manufacturer likes the processes used in his factory to be of a kind easy for the workman to learn and to practice. Labor then costs less both in money and worry.

When makers of enameled ware first wanted to sprinkle powder on iron, they set about doing it in the way in which men had for countless centuries been wont to sprinkle powder for other purposes. They took an ordinary sieve, dredge, or sifter. It was not unlike in size and shape that with which housewives had for time out of mind sifted flour or meal. The enameler, it was true, could not handle his sifter as his wife handled hers. He could not stand beside the surface he was to cover, and with both hands shake the dredge over it. He could not because that surface was part of a mass of red-hot iron. He must stand back from it. Accordingly a handle was put on the dredger. He could not shake it as his wife shook hers. Her only object was to reduce the meal to a fine powder. It made no difference whether more of it fell upon one portion of her board or pan than on another. He must sprinkle his powder uniformly. He could not force it through the meshes by moving the whole dredger and its contents more or less briskly back and fro. He must move it regularly and in one direction. It was not desirable to let it come back on its own tracks. The enameler shook his sieve by tapping upon the handle with a piece of iron. This tapping occupied one of his hands. He had to support and guide the dredger with the other. He had a disagreeable choice to make. If he used a dredge with a short handle, he had to stand very near large articles of glowing iron. If he lengthened the handle, the weight of the dredger and its contents, at the end of so long a lever became too great for his strength. What he in fact at first did was to use a dredger with a handle three or four feet long. This brought him very close to the red-hot metal. To partially protect himself from the heat he wore asbestos masks, gauntlets, and breast-plates. Even so he had an uncomfortable job. The heat was always disagreeable. At times it must have been trying. Supporting the dredger with six to eight pounds of powder in it, and moving it steadily, firmly, and accurately over the surface, was hard work.

Continuously tapping with the other hand was racking to the muscles and nerves, although the force required to give a single tap was doubtless trifling.   Not every man was physically able to handle a dredger under such conditions.   Few men could have handled it for more than a few minutes at a time.   They did not have to.   Bathtubs are the largest articles usually made.   Defendants' witnesses say that, when the short handled dredger was used, it took on an average about four minutes to cover a bathtub with the powder.   The same witnesses tell us that an expert enameler could enamel some 11 tubs in a working day of 10 hours   Each tub ordinarily was given two coats of the powdered enamel.   An enameler, therefore, in 10 hours went twice over each of 11 tubs; that is, he sprinkled 22 coats in all.   It took him 22 times 4 minutes to do it, or 88 minutes in the aggregate.   In the ordinary course of his work he handled the dredger for four minutes. He did something else for 23, then took another 4-minute turn with the dredger, and so on throughout the day.   It may be that defendants' witnesses have underestimated the number of tubs formerly enameled by a good workman in a single day.   Even so, the enameler used the dredger for short intervals only.   There were relatively long intermissions when he did not.   If it had been otherwise, the incidents related as to the exhaustion and almost collapse of the workmen could have been common and typical, instead of being occasional and altogether exceptional, as they doubtless were.   Had they been ordinary occurrences, the industry could scarcely have been carried on.

Whether they were, or were not frequent is now immaterial.   Before the first automatic dredger was invented, it had ceased to be necessary for the enameler to stand close to the glowing metal or to support the weight of the dredger and its contents.   It had occurred to some one that the handle might be supported from the ceiling.   It could easily be balanced by a counterweight.   The length of the handle was no longer limited by the physical strength of the workman.   It was made seven or eight feet long.   The asbestos armor was discarded, except upon the arm and hand most exposed.   The enameler had no great weight to support.   One arm could be devoted solely to guiding the dredger.   The other was still necessarily occupied in keeping up a continuous tapping.   This form of dredger had come generally, if· not universally, into use before the invention of the pneumatic dredger some 12 or 13 years ago.   In essence the patented dredgers differ from the unpatented in one respect only.   In the former the tapping is done by machinery.   In their predecessors it was done by hand.   The handle of the patented dredger is made of hollow metal.   In it a plunger is fitted.   By compressed air or by electricity the plunger is made to keep up a continuous and perfectly steady and uniform tapping.   The workman by the pressure of his thumb may at his will increase or decrease the frequency of these tappings, or he may stop them altogether.   The automatic dredgers were supported in the same way as the unpatented long-handled dredger had been.   The enameler who works with one can use both hands to guide the dredger.   He has nothing else to do.   His work is much simplified, and made far easier and more agreeable.   The use of both

hands gives him a better and a surer control over the motion of the dredger. There is less danger of his putting too much powder in one place and too little in another. Personally he is much more comfortable. He can work faster. At the same time he no longer feels rushed or driven. He knows now that he can put one coat on before the metal cools. Before he was not always, perhaps not usually, sure that he could. As a rule his work is now better done.

The patented dredger was useful in other ways. It could be fitted with a finer mesh. It puts the powder on the metal in a more finely divided form. This, as has been already pointed out, is an advantage. So long as the tapping was done by hand, the blows upon the handle would not always be hard enough to force the powder through a mesh as fine as that which may now be used. The powder falls from an automatically tapped dredge with a regularity and uniformity greater than that which can be given to it by the average workman. The use of the patented dredgers may or may not save enameling powder. There is testimony both ways. With such dredgers more work can be done in the same time. Other things being equal, it is probable that ware, in the enameling of which they have been used, will on the average be somewhat better enameled than it would have been had hand dredgers been employed.

The record does not enable us to tell in either absolute or relative figures or percentages how great is the saving of time or the bettering of quality. The same number of men in the same time now usually turn out more work then they formerly did. In the attainment of this end the patented dredger helps. Other things contribute. Some, but not all, of these other improvements can be used to greater advantage in connection with the automatic than with the hand dredger. How much the use of the patented dredgers improves the quality is still harder to figure out. Some men with fine tools cannot do as good work as other men with poor. The defendants' evidence seems to show that the percentage of ware of high quality turned out depends much more largely upon shop management and efficiency than it does upon the use of one form of dredger rather than another. One of the defendants' witnesses says that with the hand dredge his shop made 95 per cent. of second and only 5 per cent. of first class goods. With the automatic dredger he gets 25 per cent. of seconds and 75 per cent. of firsts. This is definite enough. Another witness for the same side, but whose experience has been had in another factory, says that with the old hand dredge he made only 5 per cent. of seconds. By the use of the automatic dredger he has brought that proportion down to 1 per cent. If each of these witnesses is even approximately accurate, it follows that one of them with an automatic dredger made five times as large a proportion of inferior goods as did the other when using a hand dredger.

All that can be safely said is that the automatic dredgers are useful tools. By their use, all other things being equal, ware can be made more cheaply and on the whole of a somewhat better average quality. No one claims that he can tell by inspection of a completed article whether the enameling powder was sprinkled upon it with a hand or

an automatic dredger.  Some of the witnesses think that, if they were shown two considerable lots of the ware in the enameling of one of which one kind of dredger had been exclusively used and in that of the other another kind, they could say upon which the powder had been shaken from a hand dredger, and upon which from an automatic dredger.  It does not appear that the experiment ever has been tried. It is quite probable, nevertheless, that the distinction could frequently be made with reasonable accuracy, provided that the two lots had both been made in the same shop by the same men and under otherwise like conditions, except as to the dredger used.  The difference of results attained in different shops as shown by the record, and the further fact that, as soon as the operation of the price restrictions was suspended, some of the defendants, although using the automatic dredger exclusively, put large quantities of seconds on the market, seem to show that it is unlikely that any one could tell upon which of two lots of the ware made in different shops or in the same shop under different conditions the hand dredger had been used and upon which the automatic.

It follows that there is no respect in which every tub in the enameling of which an automatic dredger has been used differs from every tub in the enameling of which the hand dredger has been employed. Whether the ware shall be well or ill made, whether it shall be durable or the reverse, whether it shall be sightly or unsightly, depends upon many circumstances of which the kind of dredger used to sprinkle the powder is only one, and probably not the most important. Much turns on the composition of the enamel.  Each factory makes it according to its own formula, which it tries to keep secret.  Perhaps none of the powders in use give complete satisfaction.  Experiments for their bettering are continually being made.  How controlling a part the composition of the powder plays is shown by the account given by one of defendants' witnesses of the disastrous results upon the ware of an experimental change in the powder made since the first of the present year by one factory.  The liquid enamel or slush coat must be properly made and fittingly applied.  The furnaces must be adapted to the work to be done by them.  The appliances for putting the ware into the furnace and for taking it out again must be constructed, so that with little consumption of time and labor the work will be done without damaging the delicate enamel not yet firmly fused upon its base.  The castings must be well made and of the right kind of metal.  It is quite possible that a new tool, appliance, or process may be invented for the better doing of any one of them. Its use may improve the average quality or cheapen the average cost of the ware, or both.  Every such an inventor, if he obtained a patent for his invention, would be as much entitled as Wayman to say at what price and upon what terms men might deal in the finished article in some stage of the making of which his invention had been used.

Defendants say that while it is true that the automatic dredger is a mere tool, used in only one operation of a number required for the making of the ware, and while it is conceded that merchantable ware can be made without its use, still the advantages of using it are so

great that as a commercial proposition the ware cannot be made without it. It is unnecessary to consider what legal consequences, if any, would follow if the record sustained this claim. It does not. It is true certain witnesses say that in their judgment the automatic dredgers have become necessities for the manufacture of the ware for commercial purposes. The record conclusively demonstrates that they are mistaken. Such concerns as the J. M. Kohler Sons Company and the Iron City Sanitary Manufacturing Company have no rights under any of the patents. There is no evidence of their having infringed them. They make and sell the ware in large quantities in competition with the licensed manufacturers. Moreover, if the experience of the concerns which had the right to use the patented dredger had convinced them that the ware could not without their use be made good enough and cheap enough to be sold in competition with them, it is not conceivable that they should have gone to all the trouble they did to induce those two concerns to take licenses. According to the defendants' present theory, the refusal to do so was tantamount to commercial suicide. If factories without licenses could not make ware which could be sold in competition with that made by those who had licenses, the fewer who had licenses the better for those who had.

The ware is absolutely unpatented. Any one may sell it as freely as he may a loaf of bread. No one can tell by looking at a bathtub whether enameled powder has been sprinkled upon it by a patent dredger any more than any one who eats a loaf of bread can tell whether it has been baked in an oven with a patented grate, or who lights a kerosene lamp can tell whether in the process of refining a patented tool has been used, or by taking a pinch of snuff can be sure that there was or not a patented mill used in grinding the tobacco.

If agreements in this case are not violations of the Sherman act, similar agreements among all the bakers of bread, the refiners of petroleum, the grinders of snuff will be legal, provided that somewhere in the process of making the bread, refining the petroleum, or grinding the snuff a patented tool has been used. The issue is important. It cuts deep. The record squarely presents it. It must be passed upon. The defendants say they have broken no law, even if all that has thus far been said herein be true. They rely upon what they understand to have been decided by the Circuit Court of Appeals of the Seventh Circuit in the case of Rubber Tire Wheel Co. v. Milwaukee R. W. Co., 154 Fed. 358, 83 C. C. A. 336. There the court said that no one can use a patented article without the consent of the patentee. He may fix his own conditions. It adds:

"Whatever the terms the courts will enforce them provided only that the licensee is not thereby required to violate some law outside of the patent laws, like the doing of murder or arson."

The defendants ask: "Is not the legal title to the dredger patents in Wayman?" "May any use the automatic dredgers without his consent?" "May he not make what terms he will for his license to use them?" "Will not the courts enforce those terms, provided they do not call for the violation of some law outside the patent law, like murder or arson?" "Have the defendants committed murder or arson

or anything like either?" Making a price agreement differs widely in many fundamental respects from either murder or arson. The difference is so profound that it can be easier felt than accurately defined. It is not to be found in the circumstance that almost all races of men have for countless centuries felt that murder and arson were highly immoral acts. It would not be difficult from the text of the criminal codes of many different peoples at widely separated periods of the world's history, and from the writings and sayings of ethical and religious teachers of divers creeds and races, to argue that for some thousands of years the vast majority of mankind has felt that it was also immoral to make a combination for the purpose of raising the prices of things of general use. At all times there has been a minority of shrewd and able men who have believed that such combinations were merely the reasonable exercise of superior sagacity and foresight. There never has been a time when most men, however much they disliked price agreements in things they bought, but did not sell, were not able to persuade themselves that there was nothing wrong in agreeing to keep up the prices of things they sold, but did not buy. It is not for us to say what the true ethical relation of the monopolist to the community in which he lives is. In this country those who believe that he is a dangerous wrongdoer have in lawful manner written their convictions upon the statute book. The Sherman act forbids restraint of interstate trade and attempts to monopolize it. He who does either may be punished, and that, too, in a way which the Legislature seldom directs, unless the thing forbidden is felt by the majority of the people to be unethical if not highly immoral. The use by the Circuit Court of Appeals of the Seventh Circuit of murder and arson as illustrations of breaches of law which a patentee had no greater immunity to commit than had any other man was accurate, natural, and striking. At a glance, every one could see that a patentee could not lawfully require his licensee to commit either. Unfortunately some people have persuaded themselves that those illustrations were intended as limiting the violations of law which a patentee could not require to crimes which the ordinary man feels to be of the same general type as murder and arson. Such, of course, was not the intention of the court.

A patentee may not require his licensee to sell a patented oil which flashes below the minimum temperature prescribed by state law. Patterson v. Kentucky, 97 U. S. 501, 24 L. Ed. 1115. He may not authorize his licensee to prescribe and sell his patented medicine in a state which requires of all who write prescriptions that they shall have qualifications not possessed by the licensee. Jordan v. Overseers of Dayton, 4 Ohio, 295. Selling oil with a low flashing point or prescribing patent medicine without having a state license to practice medicine would no more strike the average man as akin to murder or arson than would a combination to fix prices. In one respect they are like murder and arson. They are violations of law outside the patent laws. So is a combination in restraint of trade. What the court meant was what the court said—a patentee cannot require his licensee to violate a law outside of the patent law. Murder and arson are out-

side the patent law. Every obligation which a patentee attempts to impose upon his licensee to break any law outside of the patent law is in that respect like a requirement to commit murder or arson. In the nature of things such must be the law. A patentee is as much subject to the laws of the land as is any other man. From one special application of one class of laws he is exempt. At common law and by statute monopolies are unlawful. At common law and by statute a man who invented a new and useful thing might be given a right which would enable him for a limited time effectually to monopolize it. The courts have said that this right to monopolize what he invented cannot be taken from a patentee by ·state laws. They say it has not been taken away by Congress. All men know that Congress never intended when it passed the Sherman act to change the patent law. It did not do so.

[4] The patentee may, in spite of that law, monopolize for the term of his patent the thing which he or his assignor invented. Neither at common law nor in this country by statute has he ever had a right to monopolize anything else. As to everything not validly claimed in his patent he is as other men. If by the common law or the statutes of the state or by the enactments·of Congress men are forbidden to restrain trade or to monopolize it, a patentee may not restrain trade or attempt to monopolize it in anything except that which is covered by his patent.

[8] A patent is a grant of a right to exclude all others from making, using, or selling the invention covered by it. It does not give a right to the patentee to sell indulgences to violate the law of the land, be it the Sherman act or another. The right to exclude others is the property of the patentee. It is his very own. He may do with it as he will. A very rich man may have $100,000,000 of cash. It is his property. It is his very own. He may do with it as he will. Neither one of them can use his property to bring about a violation of law. A patentee who monopolizes his invention breaks no law. He who uses his property right to exclude others from the making, selling, or using his invention, for the purpose and with the effect of making a combination to restrain trade in something from which his patent gives him no right to exclude others, does break the law. He breaks it precisely as the individual defendants in the Standard Oil and American Tobacco Companies broke it. They had the same right to use their brains, their capital, and their credit as they thought best, as he had to use his right to exclude all others from making, using, or selling automatic dredgers. He was subject to the same limitations as they were. They could not lawfully use their brains, their money, and their credit to restrain trade in petroleum and tobacco. He cannot use his patent rights to restrain trade in unpatented bath tubs.

The defendants have pressed upon our attention many cases in the Circuit Courts and in the Circuit Courts of Appeal. Many of them have upheld the right of a patentee to fix the price below which a purchaser from him of patented articles may not sell those articles. In some of these cases it has been held that one who sells at a lower price thereby becomes an infringer, and that the federal courts have

jurisdiction of a suit brought against him on account of such sale, irrespective of the amount in controversy or the citizenship of the parties. Edison Phonograph Co. v. Kaufmann (C. C.) 105 Fed. 960; Edison Phonograph Co. v. Pike (C. C.) 116 Fed. 863; Victor Talking Machine Co. v. The Fair, 123 Fed. 424, 61 C. C. A. 58; National Phonograph Co. v. Schlegel, 128 Fed. 733, 64 C. C. A. 594; New Jersey Patent Co. v. Schaefer (C. C.) 144 Fed. 437; Id. (C. C.) 159 Fed. 171; Rubber Tire Wheel Co. v. Milwaukee R. Co., 154 Fed. 358, 83 C. C. A. 336; Goshen Rubber Works v. Single Tube A. & H. Tire Co., 166 Fed. 431, 92 C. C. A. 183. The Supreme Court has in several recent cases expressly said that it was not to be understood as expressing any opinion as to whether such restrictions when applied to patented articles were or were not valid. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502; Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 28 Sup. Ct. 722, 52 L. Ed. 1086. Wayman did not sell patented dredgers on condition that the purchasers should not resell them below a fixed price. The question of whether such restrictions upon the sale of patented articles are valid is not before us. We neither decide it nor intimate any opinion upon it.

In a number of cases the owner of a machine patent has licensed others to use the machine on condition that they would buy certain unpatented things upon which the machine operated exclusively from the patentee. Those conditions have been held valid by a number of courts. Persons who with knowledge of the terms of the license have sold to the licensee some of the unpatented things to be used on the patented machine have been held liable for contributory infringement. Heaton Peninsular Button Fastening Co. v. Eureka Specialty Co., 77 Fed. 288, 25 C. C. A. 267, 35 L. R. A. 728; Rupp, Wittgenfeld Co. v. Elliott, 131 Fed. 730, 65 C. C. A. 544; A. B. Dick Co. v. Henry (C. C.) 149 Fed. 424; Æolian Co. v. Harry H. Juelg Co., 155 Fed. 119, 86 C. C. A. 205; Crown Cork & Seal Co. v. Brooklyn Bottle Stopper Co. (C. C.) 172 Fed. 225; Crown Cork & Seal Co. v. Standard Brewery (C. C.) 174 Fed. 252. In the case of Cortelyou v. Johnson, 145 Fed. 933, the majority of the Circuit Court of Appeals for the Second Circuit declined to hold that a third person who with knowledge of the restriction sold to a licensee ordinary articles of commerce to be used upon the licensed machine was a contributory infringer. All the judges held that in the particular case there was not sufficient evidence that the defendant made the sale with knowledge as to the terms of the license, and the use to be made of the ink. The Supreme Court affirmed the decision below on the ground of want of sufficient evidence of notice. It expressly refused to express any opinion as to whether the defendant could have been held had notice been shown. Cortelyou v. Johnson, 207 U. S. 196, 28 Sup. Ct. 105, 52 L. Ed. 167. A patentee may or may not be entitled to obtain his pay for his patented machine in whole or in part by stipulating that he shall have the sole right to furnish material to be used with it. We express no opinion upon the question. It would have been presented in this case had Wayman bargained with the corporate

defendants that they should buy all their enameling powder from him. Such a bargain would have been a very different one from that now before us. The purposes aimed at by such a bargain, the relations among the defendants, and between them and the public would have all been unlike those shown in the record.

What has been said is sufficient for the determination of this case. The ware is not patented. The agreements or licenses attempt to fix the price of unpatented ware and to monopolize the trade in it. The fact that Wayman had a patent on something else, even though it was a tool used in one step of the making of the ware, gives neither him nor his licensees the right to restrain interstate trade in the ware. The ownership of a patent for a tool by which old, well-known, and unpatented articles of general use can be more cheaply made gives no right to combine the makers and dealers in the unpatented articles in an agreement to make the public pay more for it. The first and second sections of the Sherman act, "when taken together, embraced every conceivable act which could possibly come within the spirit or purpose of the prohibitions of the law without regard to the garb in which such acts were clothed. * * * In view of the general language of the statute and of the public policy which it manifested, there was so possibility of frustrating that policy by resorting to any disguise or subterfuge of form, since resort to reason rendered it impossible to escape by any indirection the prohibitions of the statute." United States v. American Tobacco Co., 221 U. S. 181, 31 Sup. Ct. 648, 55 L. Ed. 663. In what has been said it has been assumed that Wayman was the real and substantial owner of the patents. That scheme was his. That his purpose was merely to make money for himself by selling to the corporate defendants indulgences to sin against the Sherman act.

The government contends that this was not the real situation. In its view there is nothing before the court except an ordinary combination to raise and maintain wholesale and retail prices and to force all the makers and dealers in the country into it. Wayman, it says, was nothing more than the ordinary promoter. The patents served the purpose of the certificate of incorporation from New Jersey or Delaware used when the combination became a consolidation. We have not discussed this branch of the case. We will not. We refrain from doing so not because it would not be pertinent. It would. Ordinarily it would receive full consideration. Unusual circumstances shown by the record make it inexpedient and even improper to do so, if the case can be disposed of without commenting upon that aspect of it.

[5] Some months after these proceedings were begun the grand jury of the United States for the Eastern District of Michigan returned indictments against many of the defendants. They were charged with violating the Sherman law. The acts alleged against them there are the same which are made the ground of the equitable relief here asked for. The defendants have moved that further proceedings herein be put off until the criminal case has been finally disposed of, and that the taking of testimony be then reopened. It is urged that the individual defendants should in justice to themselves

testify fully and freely. It is said that this they dare not now do. They fear that something to which they swear in the civil proceeding may be used in the criminal to their hurt. This motion we cannot grant. The Sherman act provides for both civil and criminal proceedings. The Attorney General must decide whether and when either or both shall be brought. To postpone finding an indictment until after a petition for an injunction had upon final hearing been granted or dismissed would be frequently, if not usually, to wait until after the period of limitations had expired. To refuse to decide the equity cause so long as the criminal charge had not been finally disposed of might leave the public to suffer for years from what the Attorney General believed to be a harmful interference with its rights and interests. The courts cannot, unless in exceptional cases, say that either must wait upon the other. A court of equity has a wide discretion. There may be circumstances which would justify its refusal finally to act until after the indictments had been tried. In our view such circumstances are not found here. The fact that many of the defendants are now under indictment makes it our duty to be careful not to say anything which might be used either to their prejudice or to that of the government in the impending criminal trial. Some minor questions affecting particular defendants are to be passed upon.

[6] The Colwell Lead Company says it is not engaged in interstate commerce. In our view it is. It makes its ware in New Jersey. It sends it to warerooms in New York City and in Worcester, Mass., and there sells it. Its trade extends over several states. It alleges that it had no part in any of the negotiations leading up to the formation of the scheme, that it did not execute a license agreement until some three weeks after the other corporate defendants, and that, then, it refused to bind itself to charge the resale prices. It was consulted through its president some time before any of the agreements were actually entered into or before their precise terms were definitely settled. He then gave a general approval of the plan. Neither he nor it appear to have done anything further until after the others had signed up.

Some months before the Standard Sanitary Manufacturing Company, which until May 4, 1910, owned the basic automatic patent, had given the Colwell Company a revocable license to use the dredger. The latter wanted Wayman to renew the license. It apparently did not want it badly enough to be willing to bind itself to charge the uniform resale prices of the New York City plumbers to whom it sold a large part of the ware. Wayman finally agreed in writing that, if it would take a license, he would try to get from the commission of the corporate defendants leave to cut these prices whenever it found that maintaining them would seriously handicap it. If the commission would not let the Colwell Lead Company do so, the latter on 10 days' notice could terminate the agreement. It would appear that it became a party to the combination to an extent sufficient to entitle the government to injunctive relief against it.

[7] The evidence shows that two of the individual defendants, namely, Bert O. Tilden and George W. Franzheim, secretaries of the Colwell Lead and the Wheeling Enameled Iron Companies, respectively, had no part in forming the combination. They did not do anything in connection with it, except to attest in their official characters papers executed by their corporations. As to them the petition should be dismissed. Against the other defendants, corporate and individual the government is entitled to injunctive relief substantially as prayed for. In view of the pendency of the criminal case, all characterization of what the defendants have done not necessary to the effectiveness of the decree should be omitted from it. The government may submit a draft of a decree to the counsel for the defendants. If an agreement cannot be speedily had, we will upon application fix an early day for its settlement.

GOFF, Circuit Judge (dissenting). I cannot assent to the conclusion reached by the court in this opinion. The facts established by the testimony, considered in the light of the law applicable thereto, compel me to conclude that the allegations of the petition have not been sustained.