RUBBER TIRE WHEEL CO. v. MILWAUKEE RUBBER WORKS CO.

(Circuit Court of Appeals, Seventh Circuit. April 16, 1907.)

No. 1,336.

1. PATENTS—SCOPE OF MONOPOLY GRANTED—EFFECT OF STATE STATUTES.
    A state statute cannot interfere with the monopoly granted to a patentee and his assignees under the federal laws.

2. SAME—POLICY OF PATENT LAWS.
    The public policy declared by the patent laws is that it is for the benefit of the public to stimulate invention and that inventors shall publish their inventions, and to that end, and in consideration of such publication, to become effective at the end of 17 years, they insure to a patentee in the meantime absolute protection in the right to exclude every one else from making, using, or vending the thing patented without his consent.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 1.]

3. SAME—LICENSES—LEGALITY OF CONDITIONS.
    Use of a patented invention cannot be had except on the inventor's terms, and the requirement that a licensee join other licensees in a combination or pool to control the prices and output of an innocuous patented article is not in violation of the Sherman anti-trust act of July 2, 1890 (26 Stat. 209, c. 647, § 1 [U. S. Comp. St. 1901, p. 3200]). Patented articles, unless and until they are released by the owner of the patent from the dominion of his monopoly, are not articles of trade or commerce among the several states within the meaning of such act, because they are not articles in which the people are entitled to freedom of trade.

4. SAME—DECREE ADJUDGING INVALIDITY—SCOPE AND EFFECT.
    A suit for infringement of a patent is not a proceeding in rem, and a decree of a Circuit Court of Appeals in such a suit adjudging a patent void is binding only on the parties, and does not affect the validity of a license contract subsequently made between the owner of the patent and others, which is enforceable as fully and to the same extent in the circuit in which such decree was rendered as elsewhere in the United States.

**5.** Same—License Contracts—Legality.

A system of contracts between the owner of a patent for rubber-tired wheels and its licensees, fixing uniform prices and the percentage of the whole output which should be made and sold by each licensee, and providing that the business of all should be supervised by commissioners appointed by the licensor, is not rendered invalid by a provision for the accumulation of a fund by such commissioners with power to use the same with the consent of a majority in the purchase of tires from any or all of the licensees and to sell the same to the trade at such prices as they should deem for the best interest of all; it being within the right of the owner of the patent, either itself or through its licensees, to push the sale of its tires, and, in doing so, to undersell the makers of other tires or infringers.

In Error to the Circuit Court of the United States for the Eastern District of Wisconsin.

For opinion below, see 142 Fed. 531.

A. L. Humes and Edwin E. Jackson, Jr., for plaintiff in error.

Charles Quarles, for defendant in error.

Before GROSSCUP, BAKER, and KOHLSAAT, Circuit Judges.

BAKER, Circuit Judge. Plaintiff in error began this action to recover royalties on account of defendant's use, under a license system set forth in the complaint, of patent No. 554,675, issued February 18, 1896, to Grant, plaintiff's assignor, for an improvement in rubber-tired wheels. The license system was embodied in three papers, Exhibits A, B, and C. That they "were all executed at one and the same time and were intended to constitute and did constitute one agreement" is not open to question, for such is the explicit admission in defendant's answer. The covenants of defendant must therefore be taken as having been made in consideration of plaintiff's grant. The license system, briefly, was this: Plaintiff authorized 18 companies, of which defendant was one, to make, use, and sell tires under the patent for 1 year; each company's share of the trade was fixed at a certain proportion of the whole, defendant's at 2 per cent.; two qualities of tires were to be made; the minimum selling price of the first quality was established at 65 cents a pound, of the second quality at 55 cents a pound; each company agreed to pay plaintiff monthly 4 per cent. of its sales, and, if in any month its sales proved to be larger than its proportional share of the total sales for that month, to pay plaintiff an additional royalty of 20 per cent. of the amount over its quota; plaintiff agreed to employ a commission of five persons to supervise the transactions of all the parties, and to turn over to the commission all royalties in excess of 2 per cent.; from the moneys so put into their hands the commission, after deducting their expenses and compensation for services in supervising and auditing, were to pay monthly to any company that had sold less than its quota of the preceding month's total business a sum equal to 20 per cent. of such deficiency; the commission then were to accumulate $50,000, and to distribute any sums in excess monthly among the companies according to their quotas of the trade, and at the expiration of the arrangement to distribute all funds then on hand; and it was agreed in paragraph 10 "that the commission shall have power upon the written consent of a

majority of the parties in interest hereto, to purchase tires from any or all of the parties hereto at the prices hereinbefore provided and to dispose of such tires to the trade at such prices as said commission shall deem to the interest of all the parties hereto, and in making such purchases the commission is hereby authorized to use any money in its possession." The complaint proceeded to charge that defendant under this arrangement had made and sold certain amounts of the patented tires on which it had failed and refused to pay the stipulated royalties.

The defenses were that the arrangement was in violation of the Sherman anti-trust act of July 2, 1890 (26 Stat. 209, c. 647, § 1 [U. S. Comp. St. 1901, p. 3200]), and of section 1791j of the Wisconsin Statutes of 1898, which prohibits Wisconsin corporations (defendant was one) from entering into any arrangement or contract intended to restrain competition in the supply or price of any commodity constituting a subject of commerce within the state. As reasons why defendant's promise to pay was unenforceable in the face of those statutes, the answer averred that the letters patent "were and were believed by all the parties to said agreement to be invalid and void, and had been so adjudged by the United States Circuit Court of Appeals for the Sixth Circuit, and that the Supreme Court of the United States had refused to review such decision; that said patent was resorted to in said contracts merely as a pretext to enable said contracting parties to evade the laws; and that said contracts were not and were not intended to be license contracts under letters patent, but were intended to establish and bring about the illegal trade combination herein mentioned; that the aforesaid purpose was carried out by the said agreement, and by reason thereof the price of the articles of commerce mentioned in plaintiff's complaint was raised beyond the former price thereof and beyond the natural and legitimate price thereof; and that the amount of said articles manufactured by the said parties was, by reason of said combination and monopoly, restricted."

A jury having been duly waived, the court heard the evidence, entered findings of fact and conclusions of law, and thereupon rendered judgment for defendant.

The court found that plaintiff was the owner of the patent; that the patent was valid; that prior to the execution of the contracts in suit the patent had been sustained by the Circuit Court for the Southern District of New York, 91 Fed. 978, by the Circuit Court for the Southern District of Ohio (unreported), by the Circuit Court for the Northern District of Georgia, 116 Fed. 629, and by the Court of Appeals for the Republic of France, and had been declared invalid by the Circuit Court of Appeals for the Sixth Circuit, 116 Fed. 363, 53 C. C. A. 583, and the Supreme Court had declined to take the case on certiorari, 187 U. S. 641; that after the last-named decision was rendered, and down to the execution of the contracts in suit, the manufacturers of tires disregarded the patent, paid no royalties, and cut the prices of the respective qualities to 50 and 40 cents a pound; that all of the parties to the contracts in suit entered into the arrangement in good faith, believing that the patent was valid and that the adverse decision was erroneous; that all of the manufacturers that had been infrin-

ging, except two small concerns, came into the pool; that the provision in paragraph 10 was never in any manner acted upon or executed; that defendant made and sold tires under the contracts, and failed to pay plaintiff certain specified sums which were due if the promise to pay was enforceable; that after the expiration of the arrangement prices went back to former rates.

As conclusions of law the court stated (1) that the patent was and is valid; (2) that the decision of the Court of Appeals for the Sixth Circuit is controlling only between the parties to that case and their privies; (3) that as a practical result, however, the effect of that decision is to denude the patent of the attributes of a monopoly in that circuit; (4) that the provisions of the contracts respecting the payment of royalties are separate from the provisions of paragraph 10, and are not thereby rendered illegal or void; (5) that the contracts authorized the creation of a fund for crushing competition in interstate commerce throughout the whole country, not only in Grant tires but in all other rubber tires; (6) that the contracts make an illegal combination under the laws of the United States, and are illegal and void.

The assignments of error go to the third, fifth, and sixth conclusions of law.

The Wisconsin statute is eliminated not only because it is not involved in any assignment of error, but also because a state cannot subtract from the right conferred upon a patentee and his assigns by the federal laws. Columbia Wire Co. v. Freeman Wire Co. (C. C.) 71 Fed. 302; U. S. Consolidated Seeded Raisin Co. v. Griffin & Skelly Co., 126 Fed. 364, 61 C. C. A. 334. For the protection of the physical or moral health of its citizens a state may restrain the use of "the corporeal thing or article brought into existence by the application of the patented discovery" (Patterson v. Kentucky, 97 U. S. 501, 24 L. Ed. 1115), but such a laying on of hands does not touch the monopoly of the federal grant. Nothing in this record questions the innocence of rubber tires.

Apart from any support that may be afforded by the third and fifth conclusions, is the sixth conclusion sound? Does the Sherman law shield the defendant from its promise to pay? -

Under its constitutional right to legislate for the promotion of the useful arts, Congress passed the patent statutes. The public policy thereby declared is this: Inventive minds may fail to produce many useful things that they would produce if stimulated by the promise of a substantial reward; what is produced is the property of the inventor; he and his heirs and assigns may hold it as a secret till the end of time; the public would be largely benefited by obtaining conveyances of these new properties; so the people through their representatives say to the inventor: Deed us your property, possession to be yielded at the end of 17 years, and in the meantime we will protect you absolutely in the right to exclude every one from making, using, or vending the thing patented, without your permission. Bloomer v. McQuewan, 14 How. 539, 548, 14 L. Ed. 532; United States v. American Bell Telephone Co., 167 U. S. 224, 17 Sup. Ct. 809, 42 L. Ed. 144; Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058; Good v. Daland, 121 N. Y. 1, 24 N. E. 15; Fuller v. Berg-

er, 120 Fed. 274, 56 C. C. A. 588, 65 L. R. A. 381; Victor Talking Machine Co. v. The Fair, 123 Fed. 424, 61 C. C. A. 58; Rupp-Wittgenfeld Co. v. Elliott, 131 Fed. 730, 65 C. C. A. 544. Congress put no limitations, excepting time, upon the monopoly. Courts can create none without legislating. The monopoly is of the invention, the mental concept as distinguished from the materials that are brought together to give it a body. Use of the materials, as noted above, may be enjoined as injurious to the public; but that does not invade the monopoly. Use of the invention cannot be had except on the inventor's terms. Without paying or doing whatever he exacts, no one can be exempted from his right to exclude. Whatever the terms, courts will enforce them, provided only that the licensee is not thereby required to violate some law outside of the patent law, like the doing of murder or arson. Does the requirement that the licensee join other licensees in a combination or pool to control the prices and output of an innocuous patented article violate the Sherman law? We cannot dispose of the question on the authority of Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058 (see United States Consolidated Seeded Raisin Co. v. Griffin & Skelly Co., 126 Fed. 364, 61 C. C. A. 334), for according to our reading the question was expressly excepted from the decision; and so, aided by the declarations of general principles in that and other cases, we must formulate our own answer.

Under its constitutional right to regulate interstate commerce Congress made illegal "every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states," and subjected to liability to fine or imprisonment "every person who shall monopolize, or attempt to monopolize, or combine, or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states." Congress, having created the patent law, had the right to repeal or modify it, in whole or in part, directly or by necessary implication. The Sherman law contains no reference to the patent law. Each was passed under a separate and distinct constitutional grant of power; each was passed professedly to advantage the public; the necessary implication is not that one iota was taken away from the patent law; the necessary implication is that patented articles, unless or until they are released by the owner of the patent from the dominion of his monopoly, are not articles of trade or commerce among the several states. The evils to be remedied by the Sherman law are well understood. Articles in which the people are entitled to freedom of trade were being taken as the subjects of monopoly; instrumentalities of commerce between which the people are entitled to free competition were being combined. The means of effecting and the form of the combination are immaterial; the result is the criterion. The true test of violation of the Sherman law is whether the people are injured, whether they are deprived of something to which they have a right. Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679.

Grant produced a new integer in the useful arts. See Consolidated Rubber Tire Co. v. Firestone Tire & Rubber Co. (C. C. A., Second

Circuit, February 1, 1907) 151 Fed. 237. Plaintiff, as his successor in interest, is the owner of a valid patent. That stands as an unquestionable fact on this writ of error. The only grant to the patentee was the right to exclude others, to have and to hold for himself and his assigns a monopoly, not a right limited or conditioned according to the sentiment of judges, but an absolute monopoly constitutionally conferred by the sovereign lawmakers. Over and above an absolute monopoly created by law, how can there be a further and an unlawful monopoly in the same thing? If plaintiff were the sole maker of Grant tires, how could plaintiff's control of prices and output injure the people, deprive them of something to which they have a right? Is a greater injury or deprivation inflicted, if plaintiff authorizes a combination or pool to do what plaintiff can do directly? To say yes means that substance is disregarded, that mere words confer upon the people some sort of a right or interest counter to the monopoly, when by the terms of the bargain the people agreed to claim none until Grant's deed to them shall have matured.

True that "it is as important to the public that competition should not be repressed by worthless patents as that the patentee of a really valuable invention should be protected in his monopoly." Pope Mfg. Co. v. Gormully, 144 U. S. 224, 234, 12 Sup. Ct. 632, 36 L. Ed. 414. But worthless patents and other supposititious cases are not on review.

What is stated as the third conclusion of law does not affect the result. The case in the Court of Appeals for the Sixth Circuit was not a proceeding in rem. The defendant in that particular suit has a decree on which, if he were again sued for infringement of the Grant patent, he could base a plea of res adjudicata. That plea would be as good in the other circuits as in the Sixth. No other member of the public could plead that decree in any circuit. The right conclusion of law from the facts found is that, so far as the parties to the contract in suit are concerned, the patent is valid throughout the United States, and is enforceable against every one who is not able to shield himself behind an erroneous decree. If any inference of fact (or prophecy) was to be drawn from the facts found, it should have been that the Court of Appeals for the Sixth Circuit will not exempt other members of the public from the monopoly of the Grant patent. That infringers may be more contumacious in one locality than in another does not change the rights of the parties before the court. If defendant, or any other of those who entered the pool, had been before the court below in an infringement suit, the validity of the patent and defendant's use thereof without license would have compelled a decree enjoining the sale of the patented articles in Michigan, Ohio, Kentucky and Tennessee and requiring an accounting of sales already made. Consequently there was full warrant for the parties to the contract in suit to agree to pay for the use of the patent throughout the United States.

None of the provisions of the contract, in our judgment, touched any matter outside of the monopoly under the patent. The control of prices and output, for reasons already stated, did not deprive the public of any right. Both before and after the period covered by the contract the market was demoralized, prices were cut, and the owner

of the patent was getting nothing except by the slow and expensive process of litigation; but the public was not entitled to profit by competition among infringers. The internal agreements relating to royalties, proportioning the business, supervision, and penalties, did not affect or concern the public at all. Equally innocuous, in our view, was the matter stated as the fifth conclusion of law. First, the public was not injured, because the finding of fact is that the provision was never acted upon in any way. Second, if a defense had been predicated on the presence of that provision in the contract, it would have been unavailing, because that provision is separable from the royalty and other valid parts of the contract. And, third, the owner of the patent had the right, either alone or through licensees, to accumulate funds with which to push the Grant tire on the market, and in so doing to undersell the makers of other tires and infringing makers of the Grant tires. It is not for a defendant's sake that courts listen to the defense that he ought not to pay because his promise was under an arrangement to injure the public. The public is not injured by an arrangement to compete with adversaries for the public's patronage.

The evidence has not been brought up. No assignment of error questions the fullness and accuracy of the finding of facts. No cross-assignment has been made. The amount due, with interest to the date of entering the judgment hereby directed, can be computed.

The judgment is therefore reversed with the direction to enter judgment in plaintiff's favor.

GROSSCUP, Circuit Judge (concurring). I concur in the foregoing judgment; but am not prepared to hold that patented articles are never, under any circumstances, articles of trade or commerce among the several states, within the meaning of the Sherman Act; and do not think that that premise is essential to the conclusion arrived at.

The patentee, in this case, in good faith believed the patent valid, as did also all the parties entering into the contracts. Whatever, therefore, their effect may have actually been, the contracts were not intended to affect prices, except as the parties believed they had the right, because of the patent, to fix and maintain prices.

Now were the patentee the manufacturer, he would unquestionably have had the right to fix and maintain his own prices; and were the other parties to the contract manufacturers for the patentee, at a given figure for such manufacture, the patentee's right to fix and maintain the selling price would still remain; nor could this be questioned were he to make the manufacturers his selling agents also. How, then, does the contract under review make a case in which the patentee, through his manufacturer, is not entitled to fix and maintain prices—how is the arrangement, in effect, different in any way of restraining trade or competition, from the arrangement just supposed, in which the patentee unquestionably has that right?

True, in the case under review, the manufacturers, as to the public, are not competitors; but neither would they be in the cases supposed; in both cases the public suffering nothing, except what the patentee had the right to exact; for so long, at least, as the patentee is not

exacting, as the value of his invention, an unreasonable sum (and his action in that respect is not here questioned) it is within his own right to say whether the price exacted should be retained by himself, or shall be distributed among the people manufacturing for him. The contracts, therefore, in the case before us, having been made in good faith, and not as a mere subterfuge, I can see in them nothing that the Sherman Act was intended to prevent.