### UNITED STATES v. PATTERSON et al.

#### (District Court, S. D. Ohio, W. D. February 3, 1913.)

#### No. 862.

1. MONOPOLIES (§ 12*)—RIGHTS GIVEN BY PATENT—ANTI-TRUST ACT.

Both the patent laws and the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) were enacted under constitutional authority, and they must be construed together, giving full force and effect to each so far as that may be done. That a patentee, by putting his invention to use, has become entitled to a monopoly in its manufacture and sale, and that his competitors in interstate commerce therein are infringers of his patent, does not give him a right to resort to methods of unfair competition to force the competitors out of business; and such action, pursuant to a conspiracy or combination, is in restraint of interstate commerce, and in violation of the Anti-Trust Act.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

2. MONOPOLIES (§ 31*)—ANTI-TRUST ACT—PROSECUTION FOR VIOLATION—DEFENSES—EVIDENCE.

Defendants, who were officers and agents of a manufacturing corporation, were indicted for conspiracy and combination in restraint of interstate commerce in cash registers and for monopolizing such commerce, in violation of the Sherman Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]). On the trial the government introduced evidence tending to show the conspiracy, and that in pursuance thereof defendants, by methods of unfair competition, had forced competitors in interstate commerce in cash registers to go out of business and sell their plants to defendants' company. Held, that evidence offered by defendants to show that their company was the owner of certain patents, and that the machines made and sold by such competitors were infringements, did not tend to establish a defense, and was irrelevant and incompetent, unless in connection with other evidence showing that the fact of infringement, and not defendants' unlawful acts, was the cause of the competitors going out of business.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 20; Dec. Dig. § 31.*]

Criminal prosecution under the Sherman Anti-Trust Act by the United States against John H. Patterson and 29 others, officers and agents of the National Cash Register Company. On objection by the government to certain evidence offered by defendants. Objection sustained.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The defendants were indicted by a grand jury in the District Court of the United States for the Southern District of Ohio, on three counts, which may briefly and very generally be described as: (1) A charge of conspiracy in restraint of interstate trade in cash registers during the three years preceding the finding of the indictment, in the manner and by the means set forth; (2) a charge of monopolizing the cash register business during the same three years, by the means and in the manner set forth in the first count; (3) a charge of monopolizing such commerce, built up and augmented prior to the three years prior to the date of the indictment, through the conspiracy and by the means in the first count, by continuing the business during those three years. The indictment is set out at length in United States v. Patterson (D. C.) 201 Fed. 697, 699, et seq.

In the first count it was charged that the defendants, as officers and agents of the National Cash Register Company, controlled and directed the business and affairs of the company, and consciously participated in a conspiracy in restraint of interstate trade in cash registers, carried on by the several concerns, defendants' competitors, whose names are set forth, and did in fact restrain the same by certain illegal and unlawful means, and thereby wrongfully and irresistibly excluded others from engaging in that trade, none of said acts being justified or granted by letters patent, a description of the conspiracy and means being set forth as follows: "Intending to obstruct, restrict, and restrain the free flow of said interstate trade and commerce so carried on by said concerns other than said the National Cash Register Company, and compel those concerns either to go out of business or to sell and transfer their business and their facilities and instrumentalities for carrying it on to said the National Cash Register Company, so that said the National Cash Register Company could, as in most cases it in fact did, discontinue the business and the use of the facilities and instrumentalities so acquired by it, and thereby effectually and inevitably to eliminate and prevent all competition of such other concerns with said the National Cash Register Company (all of such other concerns being hereinafter referred to as competitors), said defendants, in their several capacities as such officers and agents of said the National Cash Register Company, have by concerted action and continuous endeavor carried on the business and affairs of said the National Cash Register Company upon a plan involving." Then follow 11 different descriptions of acts as the means through which the alleged conspiracy was carried into effect for the purpose of bringing about the restraint of trade complained of.

The government introduced evidence tending to show that the National Company had bought out the Lamson Cash Register Company, of Lowell, Mass., and a number of other cash registers, from time to time. When the government rested its case, the defendants put a patent expert on the stand, to whom defendants' counsel exhibited a Lamson cash register with a case on it, and a Lamson cash register with the case taken off it, and asked the witness to state to the jury whether he found in this machine the invention covered by the Ritty and Burch patent. That patent was owned by the National Cash Register Company. The government objected to the testimony, and the court made the ruling set forth in the opinion.

Sherman T. McPherson, U. S. Atty., of Cincinnati, Ohio, Edward P. Moulinier, Asst. U. S. Atty., of Cincinnati, Ohio, O. E. Harrison, Sp. Asst. Atty. Gen., of Columbus, Ohio, and John L. Lott, Sp. Asst. Atty. Gen., of Tiffin, Ohio.

Lawrence Maxwell, of Cincinnati, Ohio, John S. Miller, of Chicago, Ill., John F. Wilson, of Columbus, Ohio, and John A. McMahon, of Dayton, Ohio, for defendants.

HOLLISTER, District Judge (after stating the facts as above). The importance of the question involved in the argument is such that it would hardly suffice to merely make a ruling either sustaining or

overruling the interrogatory put to the witness. I have thought it best to give the reasons why the ruling is made as it is made, so that all may understand.

It is agreed by counsel that the interrogatory propounded to the witness James W. See, a patent expert, raises the question whether or not evidence may be introduced by the defendants of the character and scope of the patents owned by the National Cash Register Company, and whether or not the various competitor companies named in the indictment (the question immediately concerns only the application of the testimony to the transactions with the Lamson Cash Register Company) were infringers of those patents. The claim is made by counsel for the defendants that there can be no such thing as a free flow of commerce or trade in articles made in infringement of a patent, and this is on the ground that a patentee has a monopoly by virtue of the laws of the United States enacted in pursuance of constitutional authority. They say that a patentee, having a lawful monopoly by the operation of the patent laws, cannot be charged with monopolizing under the Sherman Anti-Trust Act. I pass the question, if it is a question (it was not argued or referred to), that the defendants are not the patentees of cash registers, nor is it charged that the National Cash Register Company, as such, said to be the owner of many hundreds of patents on cash registers, was a party to the alleged conspiracy or illegal monopoly.

Counsel base their claim upon the statement, found in many of the decisions, that a patentee has a monopoly, and particularly upon the language of the Circuit Court of Appeals in the Seventh Circuit, Judges Grosscup, Baker, and Kohlsaat sitting, in the case of Rubber Tire Wheel Co. v. Milwaukee Rubber Works Co., 154 Fed. 358, at page 362, 83 C. C. A. 336, at page 340, in which Judge Baker, delivering the opinion, said:

"Under its constitutional right to regulate interstate commerce Congress made illegal 'every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states,' and subjected to liability to fine or imprisonment 'every person who shall monopolize, or attempt to monopolize, or combine, or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states.' Congress, having created the patent law, had the right to repeal or modify it, in whole or in part, directly or by necessary implication. The Sherman law contains no reference to the patent law. Each was passed under a separate and distinct constitutional grant of power; each was passed professedly to advantage the public; the necessary implication is not that one iota was taken away from the patent law; the necessary implication is that patented articles, unless or until they are released by the owner of the patent from the dominion of his monopoly, are not articles of trade or commerce among the several states."

Judge Grosscup concurred in the judgment of the court, but took occasion to say (154 Fed. 364, 83 C. C. A. 342):

"But I am not prepared to hold that patented articles are never, under any circumstances, articles of trade or commerce among the several states, within the meaning of the Sherman Act, and do not think that that premise is essential to the conclusion arrived at."

This language of Judge Baker was cited by counsel for defendants in support of his argument that the restraint of trade contemplated by

the act could only be with reference to a trade which in itself might rightfully be carried on; that there could be no restraint of a trade of which the patentee has a monopoly by law; that there can be no conspiracy in restraint of such trade or illegal monopoly of it, when the one charged has a legal monopoly under the patent law. So far is the argument carried that counsel frankly claim in it that, no matter how illegal the acts charged were in themselves, not conceding their illegality at all, infringers had no right to engage in their infringing trade, and the patentee had the legal right to protect his monopoly, even with the strong arm. Counsel for the government, not admitting infringement on the part of any of the competitors of the National Cash Register Company, and assuming, for the purpose of the argument, that they were infringers, argue that the question is not material to any issue in this case.

Defendants urge: That a patent is a property right; so it is. That it may be assigned; so it may be under the patent laws. That it descends to the heirs at law; the Supreme Court has so held. But counsel have cited no case—if there had been one, they would have found it—and the assertion, usually of doubtful wisdom, may in this connection be safely made that no decision will be found sanctioning acts of violence by a patentee in the protection of his patent right, acts of violence against the claimed infringing article, or the business of infringers. And it may also be safely said that, at least until the patentee has established the validity of his patent and the fact of infringement, he will not be permitted by a court of equity, and at the suit of even one who may eventually be held to be an infringer, to engage in acts of unfair competition. Farquhar Co. v. Harrow Co., 102 Fed. 714, 42 C. C. A. 600, 49 L. R. A. 755; Adriance Platt Co. v. Harrow Co., 121 Fed. 827, 58 C. C. A. 163; Dittgen v. Paper Goods Co. (C. C.) 164 Fed. 84; Paper Goods Co. v. Dittgen, 171 Fed. 631, 96 C. C. A. 433; Renovator Co. v. Vacuum Cleaner Co. (C. C.) 189 Fed. 754, 1023.

The claim is made that the patentee, having a property right, may protect his property by destroying the property of an infringer, on the same principle that he may cut off the limbs of his neighbor's trees projecting into his yard, or cut off his neighbor's eaves projecting over his land, or may in some cases, abate nuisances, etc.; but this claim involves a misconception of the nature of property in a patent, as will be shown. It is said that a patentee may destroy infringers' business by acts of unfair competition, in self-defense; but even in criminal law the old rule was that one could defend on the ground of self-defense when he was driven to the wall, and only then.

In Ohio the rule is that self-defense may be urged in cases in which the accused believes, and has reasonable ground for believing, that he is in danger of losing his life, or of great bodily harm. He may then defend to the extent of taking life, if necessary; but surely in trade a wrongful act is no justification for another wrongful act in retaliation.

It is obvious that the question involves the nature of a patent right. There is much confusion and loose language on the subject. It is a right of an intangible character. The result of the idea involved in the

patent, embodied in a machine for instance, is the tangible thing. The thing itself may not be used as against the police laws of the state looking to the health, comfort, and welfare of its citizens. It may be taxed. It may be taken on execution. Not so with a patent right itself. A man may have a valuable patent, for instance, on a combination of ingredients making an effective explosive; but his right to use and his process of making or conveying the same may be guarded by laws in such a way as to restrict the great gain he might otherwise make through the exercise of his patent right, though he would still have the right to exclude all others from interfering with his patent right. The patent right, and the article embodying the discovery or invention, are two distinct and entirely different things.

A man may make a valuable discovery. He can disclose it, or not. He cannot complain if somebody else makes the same discovery, and takes from him the benefit of his discovery. It he discloses it, the discovery is common property. He may, however, obtain a patent, and if he has not made public use or sale of the article within two years from the date of his application for a patent, he is given certain rights. These are found in the laws of Congress, for he does not have them of common right; nor without his patent, does he have any right to his discovery not shared in by the whole community; and when he gets those rights, he has them only by virtue of the patent laws. If the patent is valid, he may for 17 years restrict, to the extent of exclusion, the rights which the rest of the community would otherwise have. Therefore the laws of Congress must be looked to in order to determine what it is that he gets, for he has no patent right except such as there found. These will be searched in vain for an express grant of monopoly to him. At best, they contain a potential monopoly. He may have a monopoly if he takes the steps which the law provides, through which a monopoly may be obtained. He may bring an action at law for damages against an infringer, and get them, if he proves the infringement. He may go into a court of equity and obtain an injunction against an infringer, if he establishes the infringement, or he may have a preliminary or temporary restraining order upon a prima facie showing of infringement. But he may only bring these actions in the courts of the United States as Congress provides; he is not at liberty to go into courts of general jurisdiction in the states, or bring his suits in the courts of the United States on the ground of diversity of citizenship. The courts of the United States are open to him, because Congress says so, and they have exclusive jurisdiction; therefore he has no common right of property in his patent right which he may enforce in any jurisdiction having general equity and law powers. He has a right to a monopoly, and he has a lawful way by which it may be brought about as established by Congress.

Now, the *right* to have a monopoly and *having* a monopoly are quite distinct. A patentee manufacturing an article under the teachings of his patent may dislike litigation. He may be unwilling to go to the expense and annoyance of pursuing infringers in the courts. His profits from his own manufacture and sale may be so great that he

does not care how many infringers are in the field, or to what extent their articles are in competition with his. Has he a monopoly? If those infringers are sending their product into distant states to customers, agents, or dealers, can the fact be successfully disputed that the infringers are engaged in interstate commerce? The Supreme Court say that commerce among the states is not a technical conception, but a practical one, drawn from the course of business. Can it be denied that the infringers' products are in competition with the patentee's, under such circumstances? Such a patentee has no monopoly, in fact; but he may have one if he takes the steps Congress has provided by which a monopoly may be secured to him. If a patentee locks the paper evidence of his patent right in his safe for the 17 years of the patent's life, and in the meantime great industries have grown up, flourishing upon the manufacture and sale of the infringing articles shipped to all parts of the country, what monopoly has he, under the circumstances? Is his monopoly inherent in the patent right itself, of itself, without anything more? And during these 17 years, are not those conducting such industries—in ignorance, it may be, of the patent—carrying on a legal business as of common right? Can the patentee, during the 17 years, sally forth with torch and ax, commit acts of unfair competition, and, with or without establishing his patent, destroy those industries, claiming to be the owner of a monopoly as of right, when in fact the monopoly does not exist? And has not Congress power under the commerce clause of the Constitution to protect a commerce which actually exists and in great volume, at least until the patentee has established his monopoly by enjoining all infringers? These questions seem to me to answer themselves.

A part of the patent right is the expressly granted power to bring suits to exclude all infringers. The patentee has no sanction under the patent laws to exclude infringers in any other way. It cannot be successfully denied that the rights a patentee has are limited and restricted by the laws which Congress has seen fit to enact on the subject, because the common right of others is interfered with and the exercise of it prevented only because Congress has, as a reward to the inventor, given him certain privileges through the exercise of which he may reap a benefit to himself, and the sole benefit to himself, of the results of his genius, in derogation, for a limited period, of the common right of all others.

The patent laws were enacted in pursuance of constitutional authority. The Sherman Anti-Trust Act was passed in pursuance of constitutional authority. They must be construed together, giving full force and effect to each, so far as that may be done, if it can be done, unless the requirements of the particular case necessarily render one or the other, as the case may be, inoperative.

The Supreme Court say of the agreements complained of in the Bath Tub Trust Case, 226 U. S. 20, at page 48, 33 Sup. Ct. 9, at page 14 (57 L. Ed. ——), decided November 18, 1912:

"They transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. They passed to the purpose and accomplished a restraint of trade condemned by the Sherman law."

And again, at page 49 of 226 U. S., at page 15 of 33 Sup. Ct. (57 L. Ed. ——):

"Rights conferred by patents are indeed very definite and extensive; but they do not give, any more than other rights, an universal license against positive prohibitions. The Sherman law is a limitation of rights, rights which may be pushed to evil consequences and therefore restrained."

And as recently as January 20, 1913, the Supreme Court, in Virtue v. Creamery Package Manufacturing Co., 227 U. S. 8, 33 Sup. Ct. 202, 57 L. Ed. ——, say:

"Of course, patents and patent rights cannot be made a cover for a violation of law. * * * But patents are not so used when the rights conferred upon them by law are only exercised."

Briefly, the Sherman Anti-Trust Act makes it unlawful to conspire in restraint of interstate trade, or to monopolize or attempt to monopolize the same. The Supreme Court have described a conspiracy as a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not unlawful in itself, by criminal or unlawful means. The act does not expressly except articles infringing a patent, nor does it refer to such articles entering into interstate commerce and in actual competition with a patented article.

It is lawful for a patentee to exclude such competition. The patent laws expressly provide that he may do so, and how he shall do it, and even if the combination or agreement complained of were to accomplish even a lawful thing, namely, the monopoly a patentee may have, still, under the definition of a conspiracy, that may not be attained by unlawful means; and if those unlawful means are in fact in restraint of competitive business actually a part of interstate commerce, then the patentee has undertaken to accomplish in a wrong way what he could do in a lawful way.

The intention of the defendants here, so far as it is disclosed by counsel, is to show by this evidence that all of these competing companies were infringers of the National Cash Register Company's patents. If, indeed, they were, such a question can be tried only in the way the statutes have provided, by an action for damages or in injunction proceedings. This is not the forum, in such a case as this, to try such a question. One reason is that the prosecution would have to prove to the satisfaction of the jury beyond a reasonable doubt that the competitive concerns were not infringers. Such a burden is never imposed in the trial of such an issue; on the contrary, the burden is upon the patentee to prove by a preponderance of the evidence that he has a valid patent and that an infringement of his patent exists. Even if, as a matter of law and fact, the competing concerns are infringers, that ultimate fact cannot be ascertained until a court of equity, if an injunction is sought, or a court of law, if damages only are sought, have determined—in the latter case with the assistance of a jury—that the patentee has proved by a preponderance of the evidence that his patent has been infringed by the defendant. Until that is done, the infringer may not know that he is an infringer. He may think, and think honestly, that he is engaging in his particular

business as a matter of common right, and combat the patentee's just claim with as pure motives as can control the action of the patentee. Consequently all courts having jurisdiction, state or federal, without regard to the patent laws, may enjoin acts by a patentee in restraint of the trade of the plaintiff, until the defendant, the patentee, establishes his right to exclude the plaintiff from trade which, until infringement is established, is recognized as being carried on of common right, no matter how much he may compete, and no matter how much the article or the business complained of may compete in the meantime with the patented article or the business through which it is put upon the market. A patentee may properly warn the offending competing manufacturer, and may call attention to his patent and his claim of infringement; but when he threatens suit and does not bring it, or engages in acts of unfair competition, a court of equity will say to him:

"Hold your hand; if you really have a patent, if the competitive concerns of which you complain are really infringing your patent, take the method the patent law has given you of establishing your monopoly by excluding your competitors, by enjoining them or seeking damages in the courts of the United States; otherwise, you interfere with your competitors' business at your peril."

If the principle involved in the attitude of courts of equity in such cases is correct—and it is well established—what becomes of the claim that the patentee is granted a monopoly by the patent laws? He has no monopoly. In such cases the question of infringement is not even an issue, and the court would not try it for the patentee if he should seek to make it an issue. Even after his patents are established by suits, and another claimed infringer than those against whom the adjudication has gone springs up, the patentee must try out the question with him, as to whether or not he is an infringer; and even though it may eventually turn out that he is an infringer, the patentee, upon his suit, will be enjoined in the meantime from interfering with his business, however competitive.

He who may be determined, in a proper suit, to be an infringer, may in the meantime exercise his common right of engaging in business in competition with the patentee; and if his business is interstate business, then the patentee, or others operating under his name, may not put such competitor out of business by unlawful means, whatever their right may be to prevent his intrusion upon the property the patentee has, by excluding the competitor from the field which Congress says may be his alone, if he takes the lawful steps provided for his protection. Until the patentee brings the suits and makes the field his own, there is no way under the patent laws, and the nature of the right given him, by which he can put his competitor engaged in interstate commerce out of business. And if two or more persons, under whatever name or form or method, however subtly devised, agree to accomplish by unlawful means that which they could accomplish in the way provided by law, then such conduct, if directed against the business of the competitors and necessarily directly affecting it, is a conspiracy against trade, and if that trade is interstate trade, it is an offense under the Sherman Anti-Trust Act.

The protection to the monopoly which the patentee may have is the right to bring suits, the result of which will establish his monopoly. This has been said in so many words. In Hawks v. Swett, 4 Hun, 146, 150, Judges Learned, Boardman, and Potter, in the Third Department of the General Term of the Supreme Court of New York, as existing under the laws obtaining at the time, said—Judge Learned delivering the opinion of the court:

"In order that we should not be misled by any false analogy, it should be noticed that letters patent for an invention confer nothing except a right to bring actions, and thereby to prevent persons from doing what they might otherwise lawfully do."

It is true that the point upon which the case turned was decided the other way in the Court of Appeals (66 N. Y. 206); but the language quoted is not necessarily involved in the grounds given for the reversal of the judgment below. Presiding Judge Learned repeats the language on this subject, used by him in Hawks v. Swett, in De Witt v. Elmira Mfg. Co., 5 Hun (N. Y.) 301, 303. In Celluloid Mfg. Co. v. Goodyear, etc., Co., Fed. Cas. No. 2,543, Hunt, Circuit Justice, cites Hawks v. Swett on the same question with approval.

The doctrine asserted in this case for the first time, that the rights of the patentee are of such character that those operating under them may agree, in order to protect them, to engage in acts of unfair competition such as are charged in this case, and even to burn their competitor's factory, or destroy the competing—as they believe, infringing—machines, by violence, whenever and wherever found, no matter how much it may affect commerce between the states, carried on by competitors, and be amenable therefor only to the police and to the criminal laws of the locality in which such acts were committed, I am unable to agree with. If a patentee has such power under the patent laws, and Congress under its authority to regulate commerce between the states is powerless to protect interstate commerce actually existing, it is high time that the patent laws be amended in order to prevent consequences of such shocking character.

Of course, acts of violence by agents of the National Cash Register Company upon agents of its competitors are not immediately involved in the question under discussion, because upon objection by the defendants to the introduction by the Government of testimony tending to show instances of fisticuffs between the agents of the National and the agents of competitors, the testimony was excluded from the consideration of the jury, for the reason, among others, that it might be difficult to determine who was immediately to blame for such occurrences, and it would be wandering from the issues to try incidental issues raised by charges of assault or assault and battery. There was, however, evidence tending to show that one of the National's agents distributed small wires to other agents in his territory for the purpose of their surreptitious introduction into competitors' cash registers, if the customer gave opportunity to the National's agents for close examination of the competitors' cash register in the customer's possession. Aside from that one instance, however, there has been no evidence tending to show actual violence to a competi-

tor's cash register in the possession of one of its customers. Therefore the argument of counsel for defendants goes further, with that one exception, than the acts of unfair competition the evidence for the government tends to prove. But the principle is the same, whether the acts of unfair competition were acts of violence upon competitors' cash registers themselves, or acts falling short of actual violence the evidence introduced by the government tends to show; and counsel's arguments have proceeded upon this basis.

The power of Congress to regulate interstate commerce is complete and supreme. It is lawful to go into the cash register business. Any one may, as a matter of right, go into the cash register business, and make his products the subject of interstate commerce, and may continue to do so until he is restrained by a court of equity, upon the fact being established that he is an infringer; and even after the establishment of such fact, he is amenable only to the court issuing the injunction, or may be subject to the payment of damages or profits, or both; but he is not, figuratively, an outlaw, to be brought in dead or alive, and his business confiscated by a patentee who is unwilling or afraid to pursue him by lawful methods, and who would destroy his business, interstate though it is, by unlawful means.

The monopoly of which the government complains, if it should be found to justly complain, is not that which a patentee has built up, however great, however wealthy, however powerful, by the lawful means the patent laws give; but a monopoly of actual trade carried on by competitors actually as a part of interstate commerce, and which equity would protect the competitors in carrying on, against unlawful acts of those operating under patents, if they have them, who, by such acts, had grasped a part of the interstate trade in cash registers, which, but for such unlawful acts, would have belonged to such competitors as of lawful right, even though they were infringers, until at least the fact of their infringement had been established by the only means given to a patentee by which he may lawfully exclude infringing competitors.

The conclusion is that the question of the validity or character or importance of the Ritty and Birch patent, or that the Lamson Cash Register Company infringed that patent, is not important, and is irrelevant, except in one aspect presented by it. The charge is that the Lamson Cash Register Company, with others, was compelled to sell out to the National Cash Register Company and go out of business by reason of the acts of the defendants, or some of them, done under a conspiracy to do them, as described in the indictment.

If the Lamson people went out of business for any other reason, then evidence to that effect would be admissible. If by reason of the suit brought against them by the National Cash Register Company, they sold out, or if they had knowledge of the character of the Ritty and Birch patent, and had knowledge or reason to believe that they were infringers, then the character and importance of that patent, and their knowledge of its character, or the advice they received on the subject, would be admissible as tending to show the existence of other reasons for their going out of business than the acts complained of in the indictment.

Thereupon, after some colloquy, the court, addressing counsel for the defendants, said in substance:

"If you can show that the Lamson people knew the character of the Ritty and Birch patent, were advised of it, knew they were infringers, or had reason to know, or were advised by their counsel that they were, or otherwise advised, then this testimony will be permitted to go to the jury only for the purpose of its tendency to show the existence of other reasons impelling the Lamson Company to go out of business than any of the acts complained of in the indictment."

Thereupon, counsel not offering to show anything more than the machine itself, and that, if the witness were permitted to answer, he would say he finds the invention covered by the Ritty and Birch patent in the Lamson machine, the objection of the district attorney to the question was sustained.